## THOMAS SULLIVAN *v.* THE STATE.

1. PROPER NAMES. — As a general rule, a middle name or initial is of no legal significance.

2. COUNTY JUDGES AS COMMITTING MAGISTRATES. — A county judge of this State is a magistrate, authorized by law to hold an examining court, and to exercise all judicial functions incident to such courts. See the opinion *in extenso* on this subject.

3. EVIDENCE OF DECEASED OR ABSENT WITNESS. — Testimony given before an examining court in the manner prescribed by law, by a witness who was confronted with the accused and subjected to cross-examination, may, on any subsequent trial of the accused for the same offence, be introduced as evidence by either the prosecution or the defence; provided it be first shown that the witness has died, or that he absents himself at the instance of the opposite party, or that, after diligent inquiry, he cannot be found or his whereabouts ascertained. If such testimony was reduced to writing, the writing is the primary evidence of it; if not reduced to writing, oral proof of it, by a witness who qualifies himself to state its substance, is competent.

4. SAME. — The mere fact, however, that a witness is out of the State does not constitute a predicate for the introduction of his testimony given at a previous judicial investigation of the case.

5. SAME. — To warrant the admission of this character of evidence, the predicate should be clearly established by proof, to the satisfaction of the court in which it is offered; and this is the more requisite because the sufficiency of the predicate must be largely confided to the discretion of that court, and is not revisable, as a matter of course, unless that discretion has been improperly exercised.

6. PROOF OF PREDICATE FOR SUCH EVIDENCE. — To lay the predicate, in a murder case, for the introduction of one Dean's testimony at a previous trial, the State proved by one S. that Dean came from Boston, Massachusetts; stayed some six months, and then left Texas; that he (S.) had written to the postmaster at Marion, Massachusetts, inquiring for Dean, and got a reply that he was in Boston, Massachusetts. *Held*, not a sufficient predicate.

APPEAL from the District Court of Gonzales. Tried below before the Hon. E. LEWIS.

The indictment charged the appellant with the murder of a freedwoman, named Harriet, on the fifth day of June, 1877, by cutting her with a hatchet.

Harriet was the cook and house-servant of Judge C. C.

De Witt, who lived across the Guadalupe River from the town of Gonzales, at a distance of two miles by the highway, but only half a mile by a foot-path. Sullivan, the appellant, had been for three months in the employ of E. Keyser, in Gonzales, by whom, however, he was discharged on the Friday preceding the Tuesday on which the murder was committed. On the intervening Sunday he was employed by Judge De Witt to do some work on his place. Tuesday morning, between seven and eight o'clock, Judge De Witt and his son, C. C. De Witt, Jr., went to Gonzales in a single-horse buggy, leaving no one on the premises but Sullivan and Harriet. Sullivan was left cutting down weeds with a scythe, at a distance from the house of about seventy yards. Harriet was left in the house attending to her household duties.

About ten o'clock of that day Sullivan made his appearance at Monroe's store, in Gonzales. He seemed to be out of breath, as if he had been running. Several persons were at the store, and he told them that Harriet had been killed. He stated that he was out in front of De Witt's house cutting weeds, when four negro men rode up, two of whom were tall, and the other two short and heavy-set, and all of whom were riding bay horses; that they asked him for his money, and he gave them two nickels, which was all he had; that they then rode through the gate into the yard, and around to the rear of the house, where the two tall ones dismounted, and the others held the horses; that the two tall negroes went into the house and passed through to the front gallery, where they found Harriet, and killed her with the hatchet, first knocking her down and then cutting her throat; after which they mounted their horses, and all rode off towards the big bottom; that, as soon as Harriet was killed, he (Sullivan) ran into the yard at the gate, and on to the east side of the yard, where he jumped the fence, made for the river, crossed in the skiff, and in getting out he got into the mud; that he then went back across the river, and, while crossing,

saw the negroes riding off; and he went to the house and changed his clothes, and then went and examined Harriet, and found her hand cold, and that she was dead; and that then he came across the river again, and on to town, for the purpose of giving the alarm.

After making the foregoing statement to the persons at Monroe's store, among whom was C. C. De Witt, Jr., Sullivan said that he wanted to inform Judge De Witt of what had happened, and then he "must go," but did not say where he must go to. Word having been carried to Judge De Witt, at the court-house, he came to where Sullivan was sitting, near Monroe's store, and his son remarked to him that Harriet was killed. Sullivan got up, said, "Yes," and was about to make a statement to Judge De Witt, when the latter stepped up and put his hand on him, saying, "Yes, and you are the rascal who killed her." Sullivan made no reply, and was then arrested and turned over to an officer.

Judge De Witt and several others then proceeded to his residence, some going by the circuitous highway and the rest by the foot-path. They found Harriet lying on the front gallery, dead, with her throat cut from ear to ear, and a cut on top of her head. In front of the gallery, a bloody hatchet was lying on the ground. Though it was an old and rusty hatchet, which had been long about the premises, it had been very recently sharpened; and a whetstone, furnished Sullivan to sharpen the scythe with, was found to have rust upon one side, as though recently used in sharpening some rusty tool. The cut on Harriet's throat appeared to have been made with the hatchet, as the gallery floor was gashed just at the spot where the blows across her throat appeared to have been struck. A broom was lying near her, and a pair of muddy black pants were hanging on a bedstead close by. A shirt and an overshirt which Sullivan had on early in the morning were on the kitchen gallery, in rear of the house, and had been recently washed. Though the ground was such as would show any horse-

tracks recently made, none could be found on the premises except those of the horse driven by Judge De Witt and his son, early in the morning. The scythe was lying where Sullivan was left cutting weeds, of which he had cut but little after Judge De Witt and his son started to town. The muddy pants found on the gallery were not the same which Sullivan was wearing early in the morning; those he wore to town were the same. Nothing had been taken from the premises.

D. Mason, for the State, testified that the morning Harriet was killed he was ploughing in his field, near Judge De Witt's premises, and from his field had a full view of the road nearly to De Witt's gate. He was on the lookout for any one going that way, because it was a usual road for cattle-drovers on their way to Kansas, and their cattle frequently injured his fence, while detained in crossing the river. He saw no one pass that way the morning Harriet was killed. That four negroes could have passed, and he not seen them, was possible, but not probable.

In addition to much that has already been stated, Judge De Witt testified that Harriet was in the habit of crossing people over the river in a skiff, and whenever any one came from town and wished to cross, she always answered their call. Sullivan had never done so, and had nothing to do with the skiff. Harriet was much attached to Dr. Knox's children, and witness had promised one of them, Buddy Knox, a pop-gun, but had forgotten to take it to town the morning of the murder. When he got to town, Buddy Knox came to him and asked for the pop-gun. Witness told him he had left it on the gallery, and for him to go down to the skiff-landing, call Harriet, and tell her to bring it to him; and he went off immediately to do so.

Buddy Knox, for the State, testified that he went down to the skiff-landing and called to Harriet three times, to bring his pop-gun; but she did not answer. Sullivan answered the call, and asked witness what he wanted. Wit-

ness told Sullivan, who then went round to the gallery, and from there brought the pop-gun to witness, who noticed that Sullivan's shoes were very muddy. Harriet had never before failed to answer witness's calls, but he saw nothing of her on this occasion. When witness called, the defendant, Sullivan, came round from the front of the gallery, and inside the yard. This was early in the day. Sullivan brought the pop-gun across the river in the skiff; his muddy shoes were the only peculiarity that witness noticed about him.

Dr. Knox, for the State, testified that he examined the wounds on the deceased. Her throat had been cut from ear to ear, apparently by two blows of some sharp instrument, struck just beneath the jaw, and severing both the main arteries. There was also a cut on the top of the head. Either wound would have produced death. No other violence had been done her person.

W. Wisenhunt, for the State, testified that Owen Dean, witness, and a negro were cutting weeds with a mowing-machine in Mr. Miller's pasture, and close by the path leading from Judge De Witt's to town. This was on the day of the murder. About ten o'clock Sullivan came along from towards De Witt's, and attracted witness's attention by speaking to the negro and to Dean, saying to the latter, "You have got into new business; can I see you a moment?" Then Sullivan and Dean walked off in front of the team, and held a conversation for some ten or fifteen minutes. Witness could not hear what was said between them. Sullivan then went on towards town. Witness heard him say nothing about a negro woman being killed. Soon afterwards persons began passing towards De Witt's.

S. M. Smeed, for the State, testified that he knew Owen Dean, but did not know his middle name, or whether he had any. He was at Gonzales from January till August, 1877, to see after his brother, who was charged with murder. He went away out of this State. Witness wrote a letter to the postmaster at Marion, Massachusetts, inquiring

for Owen Dean, and got a reply saying that Dean was at Boston, Massachusetts. Among his friends and acquaintances it is generally understood that he is at Boston, Massachusetts. Dean came from there to Gonzales.

Ed Titcombe, for the State, testified that he was deputy-clerk of the County Court of Gonzales County, and was present at the examining court held July 11, 1877, by Hon. John S. Conway, judge of said court, for the purpose of determining whether the defendant, Thomas Sullivan, should be committed to jail on the charge of killing the woman Harriet. Sullivan was present, and had an opportunity of examining the witnesses. Judge Conway asked him, in regard to each witness, if he desired to cross-examine. Owen Dean was sworn as a witness at said examing court; the oath was administered to him by witness. Dean testified in the case after being threatened with punishment by the court for refusing to testify. Witness took his testimony down in writing, and he signed his name to it as "Owen E. Dean." Witness was able to state, substantially, all that said Dean testified; and was proceeding to do so, when defendant's counsel suggested that the written testimony had better be read, and that was done.

Owen Dean's testimony at the examining trial was as follows: "I was working in Mr. Miller's pasture, just opposite Judge De Witt's house. I was sitting on the machine, and Wisenhunt was there. Sullivan came up, and made the remark that, 'You have got new business,' and wanted a few minutes' conversation with me, if I was not too busy. We went about thirty yards from the machine. He wanted to know if I had a dollar about my person. I told him I had not. He appeared as if he had been drinking, and labored under a good deal of excitement. In the meantime he was brushing the mud off of his clothes, and remarked that he wished he had some different clothes. He appeared to have been in the mud up to his knees. He then said, 'I have got to get;' and wanted to know the way to Galveston.

I was satisfied, from his deportment and manner, that some thing serious had been done. This conversation took place before the parties passed by, going over to Judge De Witt's. I left him; and he afterwards spoke to me, — that if he was arrested, would I write to his folks. He handed me a letter, which I afterwards gave to Mr. Parker. Sullivan made a confession to me. He said he had killed a negro. I asked him what he had killed her for. He answered, because she would not turn a grindstone to grind a hatchet, and he thought that if she would not help him he would fix her. He told me that he killed her with a hatchet. This statement was made voluntarily."

To the foregoing testimony of Titcombe and deposition of Dean defendant's counsel interposed objections, which are set out in the opinion; and, the objections being overruled, they reserved exceptions. The State closed her evidence.

The defence introduced E. Keyser, who testified that he had Sullivan employed about three months, and discharged him the Friday before the killing. Until a short time previous to that, witness never saw a better hand, and wanted no better. Witness discharged him because he thought he had become negligent. He had been drinking for several days before he left witness. He was drunk all Friday, Saturday, and Sunday.

The defence introduced H. S. Parker, who testified that he knew the man who called himself Owen E. Dean. Dean came from Boston, Massachusetts, but was not at Gonzales long enough to form a character. He told witness that his name was not Dean. At this point the State objected to further testimony of Dean's statements about his name. The objection was sustained, and the defence reserved exceptions. This concluded the evidence.

The jury found the appellant guilty of murder in the first degree. The court overruled his motion for a new trial, and adjudged against him the penalty of death; and he appealed.

*Harwood & Winston*, for the appellant. We lay down the following proposition: In no case is hearsay testimony admissible when the person in possession of the fact to be testified about is shown to be *in esse*.

To say that the State will be permitted to introduce bystanders to prove what the testimony of a witness was on a former trial of the same case, when the witness is admitted to be living, is to violate the well-established rule of evidence, recognized in both criminal and civil suits, that hearsay testimony is not admissible. The Bill of Rights gives the defendant the right to be confronted with the witnesses, and even he cannot introduce such character of testimony as that allowed to go to the jury in this cause, until he has satisfied the court that the witness has died since his testimony was reduced to writing.

In the case of *Johnson* v. *The State*, 1 Texas Ct. App. 334, the court bases its decision upon the ground that such testimony is only admissible when the witness has died since giving his testimony. In that event the proof of what the deceased witness said is the best evidence in existence. The original source of information has been lost, and, from the very necessity of the case, secondary evidence becomes the best testimony then to be had.

Would the court permit a party in a civil suit to introduce bystanders to prove up the testimony of witnesses on a former trial, when the witness was shown to be beyond the jurisdiction of the court? Then, if not, *à fortiori*, it cannot in a criminal prosecution. Suppose the law does not provide for the State's taking depositions in criminal causes, does that confer upon her the right to violate some other cardinal doctrine, in order that she may accomplish what the defendant would be denied? It would certainly be safer to say that the State might take depositions ; for then we would have the witness himself speaking, and not a third party interpreting what he has said.

But, if we are wrong in this position, was the court before whom the examination was had a competent tribunal?

Could that court require the defendant to plead? We think not. Being a court of limited jurisdiction, it could only take cognizance of such matters as by law it was authorized. Nowhere within the act creating it, and defining its duties and powers, does the authority appear to act as an examining or committing court in cases of felony. If that authority is granted to the county judge, under the liberal definition of "magistrate," will the court go still further, and say that the deputy-clerk of his court was, by implication, authorized to take part with him, and perform his duties in swearing the witnesses and attesting their statements? Now, if the County Court (for as such it seems to have acted) had no jurisdiction over such offences, then the whole proceeding was a nullity, and the defendant was not called upon to exercise his right of cross-examination, — had never had an opportunity of exercising such a right, — and the testimony of Dean, taken before that tribunal, would not be good testimony in any case.

The court erred in excluding evidence to the effect that the witness Dean had been passing under an assumed name; and, further, in not permitting the defendant to prove his real name.

This testimony was material. If the witness was not in fact named Dean, then it was doubtful whether the postmaster had reference to the same man whose statements were being testified about. It was a question of fact whether the man Dean in Boston was the same man who had testified before the county judge. There is nothing in the record going to show that the two were identical, and the court could not legally be satisfied that Dean was beyond the limits of the State. No process had been issued for him, nor any effort made to have him in attendance at the trial. We cannot believe this court could sanction such a practice, or establish such a precedent.

*Fly & Davidson,* also for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State. 1. On the part of the State, it is submitted that the county judge is, under the law, authorized to hold examining courts. The act of 1848 created the County Court, which was held and presided over by a judge, known as the " chief justice." This officer not only was authorized to hold examining courts, but to discharge persons accused of capital offences. The act of 1876, defining the duties, etc., of the county judge, — in sect. 29 of said act, on p. 24, Acts 1876, — only repeals such laws as are in conflict with said last act. This act, by virtue of the terms of the Constitution of 1876, created and defined the duties of the county judge, who is the " chief justice " of the county. Paschal's Digest, art. 2716, provides that the " *chief* justice " of a county shall have power to discharge a person accused of a capital crime, on examination. So, we are forced to conclude that, as the county judge is now the " chief justice " of the county, he is clothed with authority to hold an examining court, and commit or discharge the defendant, as the evidence shall determine.

2. Sect. 6, p. 11, of the Acts of 1876 gives the county clerk authority to administer oaths in all judicial proceedings to be used in any of the courts of the State.

Now, then, it appears that the county judge, or chief justice of the county, which are synonymous terms for the chief judicial officer of the county, is vested with authority to hold examining courts, and the county clerk to administer oaths. Then, there can be no objection to the examining court which inquired into the charge against appellant, it having been held by the chief justice of the county ; and least of all should appellant complain, when it does not appear that any wrong was done him in said examining court. And, moreover, appellant did not then object to these proceedings *in limine;* and it is submitted that, if he had any grounds of objection, not then having availed himself of all his rights, if he had any, it comes too late, on final

trial, for him to say that his preliminary examining trial was conducted by an officer unauthorized by law to hold an examining court.

3. Then, from the foregoing, it seems that all the proceedings were conducted by officers authorized by law to hold and conduct such matters. It is only necessary to look to sect. 16, p. 88, of Acts of 1876 to conclude, beyond the question of doubt, that the county judge (chief justice) was the officer intended by law to be the only one who should hold an examining court in capital cases. The reason is obvious. If the party was not guilty, this officer would discharge him; while, if the examination was conducted before a justice of the peace, the defendant might not be discharged without recourse to the further procedure of a hearing on a writ of *habeas corpus*.

4. Then, the remaining question is, did the court below err in admitting in evidence on final trial the testimony of Owen Dean, taken before the examining court? It is thought not. Art. 3103, Paschal's Digest, provides that the rules of evidence known to the common law of England, both in civil and criminal cases, shall govern, when not in conflict with this Code, or any statute, etc.

Then, as there is nothing in either controlling the admission of the testimony of Dean, the common law must be resorted to, to find whether it was admissible or not. Therein it is held that this kind of testimony is admissible when the witness is "*beyond the seas*," which, in England, was an expression used to indicate that the witness was outside the realm; because, as Great Britain is an island, whenever the witness was beyond the jurisdiction of the court he was necessarily "*beyond the seas*," and the phrase meant nothing more nor less than beyond the reach of any legal process by which his attendance could be forced. So, in Texas, though the witness is not in fact "*beyond the seas*," yet when he is beyond the confines of Texas he is, in law, "beyond the seas;" that is, he is outside and

beyond the reach of any legal process by which his testimony could be obtained for the State.    See *Johnson* v. *The State*, 1 Texas Ct. App. 337 ; *Drayton* v. *Wells*, 1 Nott & M. 248 ; *Sleght* v. *Kane*, 1 Johns. Cas. 76 ; *Pancoast* v. *Addison*, 1 Har. & J. 350.

5. Then, as the authorities clearly hold that this kind of evidence is admissible when the witness is " beyond the seas,"— that is, the jurisdiction of the court,— it becomes requisite, next, to see if Owen Dean, at the time of the trial, was in Texas.    The transcript shows that this witness was then in Massachusetts, fifteen hundred miles beyond the Texas border, outside the jurisdiction of Texas, — " beyond the seas " and every thing else, so far as any power in Texas could be used to bring him or his evidence here in behalf of the State.

Then, as the fact is established beyond question that, at the time of the trial, Owen Dean was " *beyond the seas*," it is in all candor contended that the testimony of him taken before the examining court was, under the common-law rule, rightfully admitted on the final trial ; that the verdict of the jury was in accordance with the legal evidence ; and that the judgment of the lower court should be affirmed.

WINKLER, J.    This is an appeal from a judgment of conviction of murder in the first degree, imposing the death penalty.    The most important and interesting inquiry here presented for consideration may be stated to be substantially as follows : —

The appellant having been accused of the murder of a woman, described in the indictment as one " Harriet (a freedwoman, whose name, other than Harriet, is to these grand jurors unknown),'' soon after the homicide was arrested, and taken before the county judge of Gonzales County for examination, on which examination a witness called Owen E. Dean testified ; and on the trial at which the conviction was had, the witness Dean not being in attendance, counsel

for the State proposed to reproduce his testimony taken before the county judge on the preliminary examination, and for this purpose placed on the stand, as a witness, one Ed Titcombe, who qualified himself to testify, in the following manner, as set out in the statement of facts: "He was deputy-clerk of the County Court, and was present at an examining trial held by John S. Conway, county judge of Gonzales County, on the 11th day of July, 1877. The examination was held for the purpose of ascertaining whether or not defendant, Thomas Sullivan, should be committed to jail, he being charged with the killing of the woman Harriet, and the examination being had to ascertain the facts in that case. The defendant, Thomas Sullivan, was present, and had an opportunity to cross-examine the witnesses. He was asked by Judge Conway if he desired to cross-examine the witnesses, and was so asked in relation to each witness. Owen Dean was sworn as a witness in said examining court by me, and testified in the case, after being threatened with punishment by the court for refusing to testify. I took down his testimony. It was reduced to writing, and he signed his statement 'Owen E. Dean.' I can state, substantially, all that said Owen E. Dean testified to on said examination. He (Titcombe) was then presented with the written statement at said trial, and was going on to state Dean's testimony, when counsel for defendant suggested that he had better read the evidence from the record; which was done, and the witness stated as follows." Here follows what purports to be the statement of Dean, as given by him on the examination before the county judge.

This testimony was admitted over objection by defendant's counsel, on the following grounds, as set forth in a bill of exceptions, to wit: "1st. Said witness had not been put under the rule with other witnesses for the State, but had been in the court-room during the trial. 2d. Because it had not been proven that Owen E. Dean was dead. 3d. Because it was not shown that Owen E. Dean was beyond the jurisdiction of the court, or was even resid-

ing permanently out of the State. 4th. Because it was not proven that the pretended statement of Owen E. Dean was made in any court having any manner of jurisdiction over the cause or over the defendant. 5th. Because it was not proven that the said purported statement of Owen E. Dean was made by said Dean under oath, and it was not shown that the pretended confessions made by said defendant to said Dean were voluntarily made." All of which objections, the bill of exceptions recites, were overruled by the court.

It is further shown by the statement of facts, and by a bill of exceptions, that certain testimony of a witness named Smeed was admitted over objection by defendant. The testimony of the witness Smeed was substantially as follows : The witness knows Owen Dean ; don't know his middle name, or that he had any. He was here for several months, to see after his brother, who was in jail, charged with murder. He was here from January until August of last year. He went away out of this State. I wrote a letter to the postmaster at Marion, Massachusetts, inquiring for Owen Dean. I got a reply, he says, saying that Dean was at Boston, Massachusetts. Among his friends and acquaintances it is generally understood that he is at Boston, Massachusetts. He said that Dean came here from Boston, Massachusetts.

The grounds or objection to this testimony, as set out in the bill of exceptions, were : First. The testimony does not show that the man Owen E. Dean was beyond the jurisdiction of the court, or that he was even living beyond the jurisdiction of the State. Second. That said evidence was hearsay. Third. That the letter of which witness spoke was better evidence than witness's statement as to the contents of said letter. Fourth. The letter referred to by witness was in regard to Owen Dean, and not Owen E. Dean ; and because the man known here as Owen E. Dean was not known in Massachusetts by that name.

Another bill of exceptions recites that the defendant offered

a witness to prove that the man called Owen E. Dean was under an assumed name, and not Dean; and also to prove that the man called Owen E. Dean stated to the witness that when the defendant made the pretended confession of guilt to him, said Dean, about which witness Titcombe had testified, that he (defendant) was laboring under *delirium tremens*, caused by excessive drink; which was ruled out, on objection by counsel for the State, and the ruling saved by bill of exceptions.

We have stated some of the questions presented by these bills of exception with, perhaps, unnecessary particularity, for the reason that, to state them plainly is to show their insignificance with reference to all that is said concerning the name of the man called Dean. We have no concern as to whether he was passing under an assumed name or not, or whether he had a middle initial letter in his name or not; the only concern the court and jury could have had was, not with the name, but with the identity of the witness who testified in that name before the examining trial before the county judge, and as to his identity there seems no room for controversy. As a general rule of law, a middle name is treated as of no consequence whatever.

The first question here presented is this: Was the county judge lawfully authorized and empowered to hold what the law denominates an examining court? We do not propose to discuss the question further than it relates to conserving the public peace and the subject of commitment, and release on *habeas corpus* after arrest, without inquiring into the general subject of jurisdiction, this not being deemed of controlling influence in the present inquiry.

It will be remembered that, from the time Texas first threw off the Mexican yoke and organized civil government under Anglo-American ideas and auspices, a part of the machinery of government was the organization of counties, and placing at the head of the judicial authority of each county a judicial officer. It was provided in the Constitu-

tion of the Republic of Texas, that "the Republic shall be divided into convenient counties," and "there shall be in each county a County Court." Const. Rep., art. 4, sects. 10, 11. And by act of December 20, 1836, the office of chief justice was created, and it was declared that the County Courts should consist of one chief justice. Pasc. Dig., note 454.

Starting from this standpoint, we find, by noticing the several provisions of the several constitutions and legislative enactments, that from that early day, through the various changes, down to the present time, there has ever been, as a part of the judiciary, the distinct feature of a County Court, presided over by a magistrate, and which feature has been maintained notwithstanding that the scope and extent of the jurisdiction has not in many respects been uniform, nor the presiding officer called by the same name; and whether the officer has been called by one name or by another, the court has been the same, and has maintained characteristics peculiarly its own. We will also constantly see that when the appellation of "county judge," "chief justice," or of "presiding justice" is used, it invariably applies to the presiding officer of the County Court; and hence we find, further, that when the Legislature, in enacting a statute, refers to the presiding officer of the County Court, the appellation in use at the time is the one employed in speaking of him.

Now, when our Codes were enacted, where reference is made to this official, the appellation of "chief justice" is usually employed, because that was the name by which he was at the time known; not to indicate any particular functions, for these are otherwise prescribed, but simply the presiding officer, the chief of the County Court. Bearing these things in mind, we need not be misled by the terms employed by the Code when speaking of this official in connection with officers, peace officers, magistrates, and examining courts, and their authority over the subject of crime, bail, and the like, and by which effect can be given to the

various provisions on these subjects, in harmony with the manifest intention of the Legislature and with established rules of applying such legislative enactments.

Some of the provisions of the Code of Criminal Procedure will be noticed : —

Art. 25. The provisions of this Code shall be liberally construed, so as to attain the objects intended by the Legislature, — the prosecution, suppression, and punishment of crime.

Art. 32. It is the duty of every officer known to this Code as a " magistrate " to preserve the peace within his jurisdiction, by the use of all lawful means ; to issue all process intended to aid in preventing and suppressing crime ; to cause the arrest of offenders by the use of lawful means, in order that they may be brought to punishment.

Art. 33. A chief justice of a county  *  *  *  who, when legally applied to, refuses to issue process, or who knowingly and corruptly refuses to discharge a duty imposed upon him by the provisions of this Code, is guilty of an o ?ence for which he is subject to removal, upon trial and conviction.

Art. 52. Either of the following officers is a " magistrate " within the meaning of this Code : The judges of the Supreme Court, the judges of the District Courts, the chief justice of the county, etc.

Art. 55. When a magistrate sits for the purpose of inquiring into a criminal accusation against any person, this is called an " examining court."

Art. 248. Upon examination of a person accused of a capital offence, no magistrate, other than a judge of the Supreme or District Court, or chief justice of a county, shall have power to discharge the defendant, etc.

Art. 249. When it is made to appear, by complaint on oath, to a judge of. the Supreme or District Court, or chief justice of a county, that the bail taken in any case is insufficient in amount, such judge or chief justice shall issue a

warrant of arrest, and require of the defendant additional security, according to the nature of the case.

Many other articles might be cited where the term *magistrate* is used, when the term would apply as well to the chief judicial county officer as to a judge of the District Court, but these will be sufficient, not only to show the importance of this magistrate in a proper enforcement of the provisions of the Code, but also the trouble and confusion which would ensue by any other interpretation of these several articles of the Code than the one here intimated, and would render nugatory many of the provisions of the Code, so far as any county officer is concerned.

In support of this application of the term *chief justice*, and strengthening our conclusions that the appellation was intended to apply to the chief judicial officer of the county, we find, on an examination of the Revised Code adopted at the recent session of the Legislature, that the term *county judge* is inserted in the revision wherever the term *chief justice* is employed in the original, in corresponding articles. So that, when the Revised Code goes into effect the confusion will disappear, until some future Legislature shall change the name of the county judge to some thing else, by unguarded enactment. It is further worthy of note that, so far as the articles of the Code which relate to the prevention and suppression of crime are concerned, and the definition of the terms *magistrate* and *peace* officer, we know of no material changes until the revision mentioned, which has not as yet gone into effect.

Our conclusions, therefore, are that, in so far as the provisions of the Code of Criminal Procedure relating to the subjects above set out are concerned, and which speak of the principal county judicial officer as chief justice, they are intended to apply to the judge who by law presides over the County Court, and that it is altogether unimportant what particular name or appellation may be given him; and that, under the provisions of the Code, that county

official, whether called county judge, chief justice, or presiding judge or justice, — or by whatever name he may be called, to distinguish him from other magistrates, — was and is authorized and empowered to hold an examining court.

In the present case, we are of opinion that the county judge had authority to inquire into the accusation against the appellant, and to either swear the witnesses himself, or cause it to be done by the clerk or deputy-clerk, and cause the same to be taken down in writing, and subscribed and sworn to by the witness Dean; and that, so far as the question of jurisdiction is concerned, the court did not err in admitting the testimony.

The next important inquiry is, was it competent for the State to prove, under the circumstances disclosed by the record, what the witness Dean had testified to before the examining court?

The Constititution (art. 1, sect. 10, of the Bill of Rights) declares that " in all criminal prosecutions " the accused " shall be confronted with the witness against him." The Code of Criminal Procedure, art. 24, provides that " the defendant upon a trial shall be confronted with the witnesses, except in certain cases, provided for in this Code, when depositions have been taken." In treating of constitutional provisions similar to the one above set out, and found in all the constitutions of the several States and in that of the United States, Mr. Cooley lays down as the correct rule, deducible from the authorities, and which we adopt as correct, the following : —

" The testimony for the people in criminal cases can only, as a general rule, be given by witnesses who are present in court. The defendant is entitled to be confronted with the witnesses against him; and if any of them be absent from the Commonwealth, so that their attendance cannot be compelled, or if they be dead, or have become incapacitated to give evidence, there is no mode by which their statements against the prisoner can be used for his conviction. The

exceptions to this rule are of cases which are excluded from its reasons by their peculiar circumstances; but they are far from numerous. If the witness was sworn before an examining magistrate, or before a coroner, and the accused had an opportunity then to examine him; or if there were a former trial, on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned, but appears to have been kept away by the opposite party." Cooley's Const. Lim., orig. pp. 363, 364.

Agreeably to Mr. Greenleaf, "upon the question whether this kind of evidence is admissible in any other contingency except the death of the witness, there is some discrepancy among American authorities." 1 Greenl. on Ev., sect. 163, note. The rule in the text appears to be that, "when the testimony was given under oath, in a judicial proceeding in which the adverse litigant was a party, and where he had the power to cross-examine, and was legally called upon so to do, the great and ordinary test of truth being no longer wanting, the testimony so given is admitted, after the decease of the witness, in any suit between the same parties. It is also received if the witness, though not dead, is out of the jurisdiction, or cannot be found after diligent search, or is insane, or sick and unable to testify, or has been summoned, but appears to have been kept away by the adverse party. But testimony thus offered is open to all the objections which might be taken if the witness were personally present."

There has also been controversy as to whether these rules apply to other than civil causes, and the position that they do not apply to criminal cases has been strenuously and ably maintained; but it seems now to be settled that these rules apply to civil and criminal cases alike, so far as reproducing the testimony of a deceased witness is concerned. Whart. Cr. Law, sect. 667, note c, and authorities there

cited. "The testimony of a deceased witness, given at a former trial or examination, may be proved at a subsequent trial by a person who heard him testify." Id., sect. 667. To this extent the question is not an open one in this court. In *Black* v. *The State*, 1 Texas Ct. App. 368, it was held that, at a second or subsequent trial of a criminal charge, it is competent for the prosecution to put in evidence testimony given at a previous trial by a witness who has since died; and such testimony may be proved by a witness who heard it given in, and who can qualify himself to state the substance of it. In *Johnson* v. *The State*, 1 Texas Ct. App. 333, it was, after mature consideration, held that the rules and practice of the common law have been substantially adopted by our Code in respect to admitting as evidence for the prosecution the deposition of a deceased witness, duly taken on a former trial of the accused by a court or an examining magistrate, and that the act of 1866 (Pasc. Dig., art. 6605), which expressly secures to the accused the right to use such evidence, does not abrogate or impair that of the State to use such testimony.

But the question here is, not as to the right to reproduce the testimony of a deceased witness taken at a former trial, but the right here claimed and exercised by the State is to prove the former testimony of a living witness; or, at least, one who is not shown or claimed to be dead, but who, it is claimed, is not within the jurisdiction of the court or its process. It is not perceived that the reason of the rule which admits proof of what a deceased witness had on some former occasion, between the same parties, on an examination into the same criminal charge, on a former trial, testified to, as admissible on a subsequent trial of the same case, does not apply with equal force to one who, though not dead, is beyond the reach of the process of the court. The testimony of the deceased witness is admitted on the idea that the deceased had been confronted with the witness on the former trial, — had met him face to face, — and that

the witness had testified before a competent tribunal, under the sanction of an oath, and an opportunity afforded for cross-examination.

The inaccessible witness has been subjected to the same ordeal, the only difference being that the one is dead and the other out of reach. Each has confronted the accused, testified under the sanction of an oath, duly administered; and as to each, an opportunity for cross-examination has been afforded. According to Mr. Bishop, the principle on which these depositions are — under statutes like those which prevailed in England down to a recent period — admissible is that, being regularly taken under provision of law, the common law accepts them when it is impossible the personal presence of the witness can be had. · 1 Bishop's Cr. Proc., sect. 1096. It is, however, plain, in matter of judicial reason, that this right to introduce the deposition grows out of the great doctrine of necessity. * * * And in practice it was never known that the sort of depositions thus mentioned were received when the living presence of the witness could be had. Id., sects. 1098, 1099.

The principle applies, not only to these formal depositions, but likewise to evidence of what a witness testified orally at a previous trial. It, moreover, prevails not only in civil causes, but in criminal; and, in general, in the United States as well as in England. There are with us, perhaps, some judicial localities in which this doctrine is not received. * * * But the admission of the evidence is limited, or nearly so, to the case in which the witness is deceased; and in this case it is the general American doctrine to receive equally the depositions taken as before mentioned, and evidence of the former, or oral, testimony. If the witness is absent by the procurement of the defendant, it is, perhaps, the American doctrine, the same as it is the English, that the deposition, or evidence of his former testimony, may be received against him. But when the witness is, without this element, merely in another State, or otherwise beyond

the power of the court, this is not sufficient.  1 Bishop's Cr. Proc., sect. 1098.

These and similar rules — deduced, as they are, from adjudications in other States and countries — are of necessity based upon, and influenced more or less by, statutory regulations, and liable to be modified and controlled thereby, and with us must be held in subordination to whatever local statute, if any, we have on the subject.  Here we have a statute which provides that " the rules of evidence known to the common law of England, both in civil and criminal cases, shall govern in the trial of criminal actions in this State, except when they are in conflict with the provisions of this Code or some statute of this State."  Code Cr. Proc., art. 638.  " The rules of evidence prescribed by the statute law of this State in civil suits shall, so far as applicable, govern also in criminal actions, when not in conflict with the provisions of this Code or of the Penal Code." Id., art. 639.  " In proceedings before an examining court, the testimony of all the witnesses shall be reduced to writing, signed by them with their names or marks, and all the testimony thus taken shall be certified to by the magistrate."  Id., art. 238.  " The examination of witnesses shall be in the presence of the accused."  Id., art. 240. " Should no counsel appear either for the State or the defendant, the magistrate may examine the witnesses, and the accused has the same right."  Id., art. 247.

" In all criminal prosecutions, when the testimony of a witness has been reduced to writing, signed, and sworn to before an examining magistrate, or before any court, and the witness has died since giving his testimony, the testimony so taken and reduced to writing may be read in evidence by such defendant, as proof of the facts therein stated, upon any subsequent trial for the same offence; *Provided, however*, that in all other respects the testimony of such deceased witness shall be subject to the established rules of evidence in criminal cases.  In every case, the death

of the witness must be established to the satisfaction of the court." Pasc. Dig., art. 6605. Whilst this seems to be a privilege granted to the accused, yet, as we have seen in *Johnson* v. *The State*, 1 Texas Ct. App. 333, by the rules of practice the prosecution virtually has the same privilege. And whilst the provisions of this article, as well as the ruling in Johnson's case, have reference to the testimony of a deceased witness, as we have already seen, the reason for the rule applies as well to a witness whose personal presence cannot be had, and that the testimony of a witness who had been spirited away after having testified ought to be received.

Yet, inasmuch as this species of testimony is admitted as a sort of judicial necessity, the proof of the facts which constitute the necessity for the departure from general rules ought to be clearly established, before the testimony is admitted, — as, that the witness is dead, that diligent inquiry has been made for him where it is most likely he would be found, or that the defendant had caused his absence. The proof on this subject should be complete and satisfactory, as the question of the sufficiency of this proof would necessarily be confided largely to the discretion of the judge, and not be revisable on appeal when properly exercised.

On the whole, we are of opinion the authorities warrant the following conclusions : First, that a county judge is a magistrate authorized to hold an examining court ; second, that when a witness has testified before an examining court on the investigation of a criminal charge against any person, the testimony taken before such examining court, in the manner prescribed by law, may be used as testimony on the trial, upon satisfactory proof being first made that the witness whose testimony is offered has either died since testifying, or been prevented from attending by the opposite party, or that he cannot, after diligent inquiry, be found, or his whereabouts ascertained ; and that the testimony so taken and reduced to writing before an examining magistrate may

be used either by the prosecution or by the accused; third, that when a witness has testified on a former trial of the case, it is competent for either party to prove what the witness, if he has since died, testified on the former trial; and, fourth, that, in either case, the bare fact that the witness was out of the State at the time of the second trial would not, of itself, be sufficient ground for admitting proof of his former testimony in a criminal prosecution, unless admitted by consent.

Applying these rules to the case at bar, we are of opinion the prosecution had a right to read as evidence on the trial the testimony of the witness Dean, given in the examining court before the county judge, and that the better evidence as to what he testified would have been the production of the written testimony so taken; and on this account we see no error, as it appears that the witness Titcombe read from the written statement of the witness Dean, taken on the preliminary examination before the county judge.

Yet we are of opinion that the absence of the witness Dean was not sufficiently accounted for, at the trial, to allow the introduction of his testimony taken before the examining court. The evidence upon which Dean's testimony was admitted was that of the witness Smeed, hereinbefore set out, which need not be repeated, and which is mentioned in the second bill of exceptions taken to the admission of Smeed's testimony. To our mind, the tangible defect in this testimony is the want of any showing of proper effort to ascertain the fact as to whether the witness Dean could be produced on the trial, or not; whereas it should have been shown that it was not in the power of the State to produce the witness in person, before admitting his former testimony. One main ground of the statement of the witness Smeed appears to have been based partly upon a letter, which was not even produced on the trial. We are of opinion the showing, taken as a whole, did not show either that any proper effort had been made to learn the whereabouts of the witness

Dean, or to show the inability of the prosecution to produce him in person on the trial. This was a matter of great moment to the accused. He did not stand by in silence and permit the error to be committed without objection; on the contrary, he objected to the proceeding at the time, and also followed it up by bill of exceptions, and in his motion for a new trial, and in his assignment of errors, substantially; and for this error, which is the turning-point in the case, the judgment must be reversed.

It is shown by bill of exceptions that the defendant offered to prove by a witness (Parker) that the witness Dean was passing under an assumed name. There was no error in excluding this testimony; it was but hearsay.

We are of opinion the objections to the charge of the court are not well taken. In the main, the charge correctly informed the jury on the law of the case as made by the evidence, and there was no important omission. Whether this would be a proper charge on another trial, or not, depends upon the case and the testimony as the same shall be developed. If the charge should need modification or enlargement, these will readily suggest themselves when the occasion arises. There is nothing further suggested by the record requiring any special ruling.

For the single error above set out, the judgment must be reversed and the cause remanded.

*Reversed and remanded*